**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CENTRAL GROCERS, INC., *et al.*, | ) | Chapter 7 |
| Debtors. | ) | |
| _____ | ) | Case No. 17-13886 |
| HOWARD B. SAMUELS, | ) | (Jointly Administered) |
| solely as chapter 7 | ) | |
| trustee of the estates of CENTRAL | ) | Hon. Pamela S. Hollis |
| GROCERS, INC., *et al.*,[1] | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary No. 18-00734 |
| JAMES J. CASACCIO, THOMAS J. | ) | |
| CASACCIO, LEAMINGTON FOODS, | ) | |
| INC., CASACCIO BROTHERS, INC., | ) | |
| MARKET FRESH, INC., and MARKET | ) | |
| FRESH NORTH, INC. | ) | |
| Defendants. | ) | |

## ANSWER TO COMPLAINT AND AFFIRMATIVE DEFENSES

Now come the Defendants, James J. Casaccio, Thomas J. Casaccio, Market Fresh, Inc.,

and Market Fresh North, Inc., through their undersigned attorneys, and for their Answer and

Affirmative Defenses state:

## JURISDICTION AND VENUE

1.    This adversary proceeding relates to the above-captioned bankruptcy case (the

"Bankruptcy Case"), which was commenced on May 2, 2017 (the "Petition Date") under title 11

of the United States Code (the "Bankruptcy Code").

**ANSWER: Admits.**

2.    This Court has subject matter jurisdiction over this proceeding pursuant to 28

U.S.C. §§ 157(a) and 1334(b), as well as Internal Operating Procedure 15(a) of the United States

---

[1] The Debtors in these Chapter 7 cases, along with the last four of each debtor's federal tax identification number, as applicable, are Central Grocers, Inc. (3170), Strack and Van Til Super Market, Inc. (2184), and SVT, LLC (1185).

District Court for the Northern District of Illinois. This matter is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (B), (E), (F), (H), and (O).

**ANSWER: Admits.**

3.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

**ANSWER: Admits.**

4.     Pursuant to Rule 9015-1 of the Local Rules of Bankruptcy Practice and Procedure for this Court, the Trustee states that he consents to the entry of a final order or judgment by this Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution with respect to any of the requests for relief set forth in this Complaint.

**ANSWER: Defendants do not consent to the entry of a final order of judgment by this Court. Defendant denies any remaining allegations.**

## PARTIES

5.     Plaintiff HOWARD B. SAMUELS is the Chapter 7 trustee (the "Trustee") for the bankruptcy estates of Central Grocers, Inc. ("CGI"), Strack and Van Til Super Market, Inc. ("Strack"), and SVT, LLC (together with Strack, "SVT").

**ANSWER: Admits.**

6.     Defendant JAMES J. CASACCIO ("James Casaccio") is an individual residing at 613 S. Ardmore Ave., Addison, Illinois 60101.

**ANSWER: Admits.**

7.     Defendant THOMAS J. CASACCIO ("Tom Casaccio") is an individual residing at 613 S. Ardmore Ave., Addison, Illinois 60101.

**ANSWER: Admits.**

8.    Defendant LEAMINGTON FOODS, INC. ("Leamington") is an Illinois Corporation with its principal place of business at 500 N. Mannheim Rd., Hillside, IL 60162. Leamington may be served with process through its registered agent, Kenneth A Casaccio, at 5467 W. Madison, Chicago, IL 60644.

**ANSWER: The allegations contained in paragraph 8 are not directed to these Defendants. These Defendants lack information sufficient to form a belief as to the truth of the allegations.**

9.    Defendant LEAMINGTON FOODS – ROOSEVELT ("Roosevelt") is a store owned and operated by Leamington and is located at 3240 W. Roosevelt, Chicago, IL 60624.

**ANSWER: The allegations contained in paragraph 9 are not directed to these Defendants. These Defendants lack information sufficient to form a belief as to the truth of the allegations.**

10.    Defendant CASACCIO BROTHERS, INC. D/B/A LEAMINGTON FOODS ("Brothers") is an Illinois Corporation with its principal place of business at 5467 W. Madison, Chicago, IL 60162. Brothers may be served with process through its registered agent, Kenneth A Casaccio, at 5467 W. Madison, Chicago, IL 60644.

**ANSWER: The allegations contained in paragraph 10 are not directed to these Defendants. These Defendants lack information sufficient to form a belief as to the truth of the allegations.**

11.    Defendant MARKET FRESH, INC. D/B/A MARKET FRESH FINER FOODS ("Market Fresh") is an Illinois Corporation with its principal place of business at 800 N. Kedzie Ave, Chicago, IL 60651. Market Fresh may be served with process through its registered agent, James J Casaccio, at 800 N. Kedzie Ave, Chicago, IL 60651.

**ANSWER: Admits.**

12.     Defendant MARKET FRESH NORTH, INC. D/B/A MARKET FRESH FOODS ("North," and together with James Casaccio, Tom Casaccio, Leamington, Roosevelt, Brothers, and Market Fresh, the "Defendants") is an Illinois Corporation with its principal place of business at 6209 W. North Ave., Oak Park, IL 60302. Market Fresh North may be served with process through its registered agent, Gary W. Seyring, at 1051 Perimeter Dr., Suite 400, Schaumburg, IL 60173.

**ANSWER: Denies.**

### BACKGROUND
### A. CGI'S COOPERATIVE PROGRAM

13.     CGI was a Chicago-based grocery cooperative with hundreds of members who operated grocery stores located in Illinois, Indiana, Iowa, Michigan, and Wisconsin. Members joined CGI to participate in its purchasing, dividend, equity, and lending programs.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

14.     Members were required to maintain "good standing" status to participate in CGI's programs. The requirements for good standing, along with the other rights and duties of membership, were set out in CGI's membership agreement (the "Membership Agreement"),[2] its Amended and Restated By-Laws (effective November 2012) (the "By-Laws"),[3] the Rules and Regulations (effective March 2013) (the "Rules & Regulations"),[4] its Amended and Restated Articles of Incorporation (as amended 2015) (the "Articles"),[5] and its Member Loan Policy and

---

[2] The Defendants' Membership Agreements are attached as Exhibit A.
[3] The By-Laws are attached as Exhibit B.
[4] The Rules & Regulations are as Exhibit C.
[5] The Articles are attached as Exhibit D.

Procedure (effective January 2010) (the "Loan Policy").[6] Each member signed the Membership Agreement, thereby agreeing to comply with the By-Laws, the Rules & Regulations, the Articles, and the Loan Policy.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

## 1. The Purchasing Program

15.    Members in good standing were eligible to participate in CGI's purchasing program. Members received goods from CGI on account, and CGI received payment through automated clearing house ("ACH") transactions drawn from the member's bank account (the "Purchasing Arrangement"). Members were required to maintain deposit accounts ("Purchase Deposits") with CGI at amounts tied to their weekly buying volume. *See* Ex. A at 4; Ex. B at 27-28; Ex. C § 5. If a member failed to maintain an ACH account or failed to maintain appropriate Purchase Deposits, that member was deemed to be in violation of By-Laws and was no longer in good standing. *See* Ex. B at 28-29; Ex. C § 3. A member also lost its good standing status if payment to CGI was not made within the 12-day payment term. *See* Ex. B at 28-29; Ex. C §§ 3(d), 6.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

16.    To terminate purchasing from CGI, members were required to adhere to the procedure outlined in the By-Laws: a member either had to sell or close all its retail locations concurrently with termination or terminate at fiscal year-end and provide 60 days' written notice to CGI (the "Termination Procedure"). *See* Ex. B at 28. If a member failed to comply with the

---

[6] The Loan Policy is attached as Exhibit E.

Termination Procedure or violated any other provision of the By-Laws, that member was no longer in good standing, and that member forfeited any amount otherwise owed by CGI to such member. *See id.* at 25, 28, 29.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

### 2. The Patronage Dividend Program

17.     Members in good standing were also eligible to participate in CGI's patronage dividend program, which was governed by the By-Laws and the Rules & Regulations. At the close of each fiscal year, CGI's board of directors (the "Board") determined how much of CGI's profit to retain for costs, debt service, and any other reason deemed to be in the best interests of CGI. *See* Ex. B at 25, 27. The remaining profit, if any, was then distributed to members as a patronage dividend. If a member failed to maintain good standing or adhere to any provision of the By-Laws, including the Termination Procedure, it forfeited all rights to patronage dividends. *See* Ex. B at 25, 29.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

18.     Members received their share of a patronage dividend either as a distribution of cash, stock, and credit at the end of the fiscal year, or as quarterly cash payments made in advance of the anticipated year-end dividend, with a final distribution of the balance as cash, stock, and credit at the end of the fiscal year.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

19.    On or about September 15, 2016, the Board authorized a $44.5 million patronage dividend, subject to final adjustments, for the fiscal year ending July 30, 2016 (the "2016 Patronage Dividend"). None of CGI's governing documents, nor any other agreement, required CGI to pay the 2016 Patronage Dividend or any portion thereof. As noted above, the Board had broad discretion under the By-Laws to retain some or all of CGI's profits for costs, debt service, and any other reason deemed to be in CGI's best interests. In fact, when the Board authorized the 2016 Patronage Dividend, CGI was insolvent and had been since at least January 2016.[7]

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

20.    Shortly after authorizing the 2016 Patronage Dividend, the Board learned that CGI had violated the liquidity covenants in its $150 million credit facility. In turn, CGI's lenders demanded—as a condition for not declaring a default on the credit facility—that CGI defer paying 30% of the 2016 Patronage Dividend until CGI achieved compliance with such liquidity covenants (the "Deferred Dividend").

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

21.    On or about October 13, 2016, the Board authorized the Deferred Dividend, thereby amending the 2016 Patronage Dividend so that CGI had no obligation to pay the Deferred Dividend until the company was able to make such payment without violating its liquidity covenants. CGI subsequently sent letters to its members, explaining that the Deferred Dividend had been approved and that 30% of each member's 2016 Patronage Dividend would be recorded solely for bookkeeping purposes in the member's deposit account. CGI's financial

---

[7] *See infra* Section C.

condition never recovered such that it could pay the Deferred Dividend and comply with the liquidity covenants.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

### 3. The Allowance Dividend Program

22.    Members also profited from CGI's participation in allowance programs with its vendors. CGI entered into contracts with its vendors whereby it would commit to purchase a certain amount of product and in return the vendor would provide CGI a rebate—called an allowance—on its purchases.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

23.    On October 27, 2016, while insolvent, CGI paid its members over $2,500,000 in dividends from profit it earned on vendor allowance programs (the "2016 Allowance Dividend"). None of CGI's governing documents, nor any other agreement, required CGI to pay the 2016 Allowance Dividend.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

### 4. The Equity Program

24.    Members in good standing were further eligible to participate in CGI's equity program. CGI had Class A voting stock and Class B non-voting stock. Upon joining CGI, every member was required to purchase five Class A shares at $100 par value, and the value of Class A shares always remained $100 per share. *See* Ex. D at 2-3; Ex. B at 6. The value of Class B shares was determined based on an annual valuation of CGI. *See* Ex. B at 2, 9. Members purchased

Class B shares through CGI's stock option program or received such shares as a component of their patronage dividend. *See* Ex. B at 15-16, 26.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

25.    Certain members received Class B shares as a component of their 2016 Patronage Dividend and then immediately requested that CGI redeem those shares. On or about November 17, 2016, while insolvent, CGI issued redemption checks to requesting members (the "Redemption Payment") in order to redeem Class B shares received as a component of their 2016 Patronage Dividend. CGI had no obligation to redeem the Class B shares through the Redemption Payment.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

### 5. The Lending Program

26.    Finally, members in good standing were eligible to participate in CGI's member loan program. On or about October 15, 2014, CGI loaned $500,000.00 to North and in return the North executed a promissory note for $500,000.00 in favor of CGI (the "Note"). In connection with the Note, CGI also received the following related documents: (a) board resolution from North authorizing the loan; (b) security agreement from North; (c) cross-collateralization agreement from Market Fresh; (d) cross-default agreement from North and Market Fresh; (e) board resolution from Market Fresh authorizing its obligations; (f) hypothecation agreement; (g) business purpose affidavit from James Casaccio; (h) business purpose affidavit from Tom Casaccio; (i) personal guaranty of James Casaccio; (j) personal guaranty of Tom Casaccio; (k) indemnity agreement from North; (l) indemnity agreement from James Casaccio; (m) indemnity

agreement from Tom Casaccio; and (n) mortgage (together with the Note, the "Loan Documents").[8]

**ANSWER: Defendants admit that copies of the Loan Documents are attached to the Complaint. Defendants deny any remaining allegations.**

27.    Under the Note, North was required to make installment payments of principal and interest to CGI until the principal amount was paid in full. A missed payment resulted in default. *See* Ex. F-1 at 3; Ex. E § III(5).

**ANSWER: Defendants admit that North was required to make payments on the Note. Defendants deny any remaining allegations.**

28.    In the event of default, the Loan Documents provided CGI recourse. For example, CGI had the right to charge late fees and default interest. *See* Ex. F-1 at 3; Ex. E § III(5). CGI was also entitled to accelerate the Note and declare all outstanding interest, penalties, and principal immediately due. The Note provided for the following procedure related to acceleration (the "Acceleration Procedure"):

> Notice of Default. If Borrower is in default, Lender may send Borrower a written notice telling Borrower that if Borrower does not pay the overdue amount by a certain date, Lender may accelerate this Note and require Borrower to pay immediately the full amount of principal which has not been paid and all the interest that Borrower owes on that amount. Such date must be five (5) days after the date on which the notice is delivered or mailed to Borrower.

Ex. F-1 at 3.

In addition to default for missed payments, if North failed to maintain good standing, CGI was entitled to, among other things, charge default interest and late fees, sue on the Note and the guaranties, and foreclose on any collateral. *See* Ex. E § III(5), (10).

---

[8] The Loan Documents are attached as Exhibit F-1 through F-15.

**ANSWER: Defendants deny that the allegations contained in paragraph 28 fully and accurately recite the provisions of the Note, and deny any further remaining allegations.**

**B. DEFENDANTS' PARTICIPATION IN CGI'S COOPERATIVE PROGRAM**

29.     Defendants executed the Membership Agreements, thereby becoming bound by those agreements, the By-Laws, the Rules & Regulations, the Articles, and the Loan Policy. Defendants never resigned their CGI membership prior to the Petition Date.

**ANSWER: Denies.**

### 1. Receipt of and Failure to Pay for Goods

30.     As of the Petition Date, Defendants had received, but had not paid for, goods on account from CGI in the amount of $286,037.72 (the "Unpaid Receivable") and had $100,000.00 in their Purchase Deposit accounts. Defendants received and accepted the goods but cancelled their ACH accounts before CGI could draw payment. Defendants then terminated purchasing from CGI by April 24, 2017, without adhering to the Termination Procedure.

**ANSWER: Denies.**

31.     Defendants' failure to remit payment for the Unpaid Receivable, failure to maintain an ACH account, and failure to terminate purchasing in accordance with the Termination Procedure constitute material breaches of the Purchasing Arrangement, the Membership Agreement, the By-Laws, and the Rules & Regulations.

**ANSWER: Denies.**

32.     Accordingly, Defendants (a) owe the Unpaid Receivable to CGI, (b) are no longer in good standing with CGI, (c) lost all rights to Patronage Dividends, and (d) forfeited any other amount owed to them by CGI.

**ANSWER: Denies.**

## 2. Receipt of Avoidable Transfers

33.    CGI transferred $137,822.10 of the 2016 Patronage Dividend (the "Patronage Dividend Transfers") to Defendants Leamington, Roosevelt, Brothers, Market Fresh, and North (the "Avoidance Defendants") as indicated on the Patronage Dividend Transfer Schedule attached as Exhibit G-1.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

34.    CGI transferred $18,949.19 of the 2016 Allowance Dividend to the Avoidance Defendants (the "Allowance Dividend Transfer") as indicated on the Allowance Dividend Transfer Schedule attached as Exhibit G-2.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

35.    CGI made a $9,048.00 transfer to the Avoidance Defendants as Redemption Payments as indicated on the Redemption Payment Schedule attached as Exhibit G-3.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

36.    CGI transferred $149,560.00 to the Avoidance Defendants to reduce their Purchase Deposit accounts (the "Purchase Deposit Transfers") as indicated on the Purchase Deposit Transfer Schedule attached as Exhibit G-4. The Purchase Deposit Transfers represented a return of cash or other consideration the Avoidance Defendants had contributed toward their Purchase Deposits.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

**3. Breach of Promissory Note**

37.     North ceased making any payments on the Note as of May 17, 2017, and therefore is in default under the Note.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

38.     On or about May 31, 2018, in accordance with the Acceleration Procedure, the Trustee sent demand letters to Defendants (the "Demand Letters"), notifying Defendants of the default and demanding payment of the overdue amount on the Note.[9] The Trustee also demanded payment for the Unpaid Receivable, the Patronage Dividend Transfers, the Redemption Payments, and the Purchase Deposit Transfers. Defendants did not respond to the Demand Letter and did not remit payment to the Trustee.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

39.     On or about June 5, 2018, the Trustee accelerated the Note. Accordingly, all outstanding principal ($362,000.00), interest ($24,507.06), and penalties ($40,305.36) under the Note are immediately due and payable by North in the aggregate amount of $426,812.42 (the "Note Obligation").

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

**C. CGI'S INSOLVENCY**

---

[9] The Demand Letter is attached at Exhibit H.

40.    CGI was insolvent at the time of the 2016 Patronage Dividend, and at the time of each of the Patronage Dividend Transfers, Allowance Dividend Transfers, and Purchase Deposit Transfers described above.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

41.    CGI suffered declining financial performance throughout 2015, 2016, and 2017.Although it did not file for bankruptcy until May 2017, CGI was doomed to fail long before then. A primary driver behind CGI's collapse was the declining condition of SVT—CGI's retail grocery subsidiary and largest customer. A decline in SVT's performance affected CGI in several important ways. It reduced the cash flow from SVT, reducing CGI's ability to pay its debts as they came due. It reduced the value of CGI's Class B stock, thereby reducing the incentive for grocery retailers to become or remain Members. And it reduced the amount of product that SVT purchased from CGI, thereby reducing the amount of product that CGI purchased from its vendors, which diminished CGI's buying power and made CGI less attractive to grocery retailers.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

42.    CGI's declining performance quickly became evident in its reported financial numbers. As to its income statement, CGI suffered a net loss of over $49 million for the fiscal year ending July 30, 2016. As to its balance sheet, CGI recognized a $28 million impairment charge against goodwill and a $39 million impairment charge against fixed assets for fiscal year 2016. The causes of the deterioration in CGI's financial condition that led to these year-end impairment charges were also present in early 2016.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

43.    Even with these impairments to its assets, CGI's balance sheet still overstated the company's financial condition from a fair market perspective. Given the likelihood that CGI would soon fail, certain contingent liabilities should have been recognized on the company's consolidated balance sheet in 2016, including a significant portion of the following liabilities: (a) approximately $95 million in unfunded pension withdrawal liability; and (b) approximately $120 million in lease liabilities. In addition to its liabilities being understated, certain of CGI's assets were overstated on its balance sheet. CGI's distribution center, for instance, was carried on its balance sheet at $89 million throughout 2016 but sold for only $61 million in July 2017.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

44.    The marketplace confirmed that CGI's assets were worth less than its liabilities long before CGI filed for bankruptcy. From August 2015 to April 2016, with the help of an experienced financial advisor, CGI marketed itself for a potential sale or merger, but failed to attract a viable offer that would pay off CGI's debts and return a profit to its shareholders. The Board should have pursued any transaction it could have achieved to reduce the ultimate loss to creditors, but the market itself had demonstrated that CGI's assets were worth less than its liabilities. When CGI abandoned these sale or merger efforts in April 2016, one Board member candidly expressed concern about CGI's survival, asking: "Is this Company beyond repair?"

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

45.    CGI's lenders shared these concerns. During a September 2016 meeting with the company's management, CGI's lenders expressed "great concern as to the direction of the Company." Moreover, as discussed above, shortly after the Board authorized the 2016 Patronage Dividend in September 2016, CGI's lenders forced CGI to defer paying 30% of the dividend because paying the full 2016 Patronage Dividend put CGI in violation of its liquidity covenants.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

**CAUSES OF ACTION**
**COUNT ONE**
**Turnover of Property**
**Pursuant to 11 U.S.C. § 542(b) – Unpaid Receivable**
**(Against All Defendants)**

46.    The Trustee re-alleges the allegations set forth in the above paragraphs.

**ANSWER: Defendants restate their answers to the above paragraphs as for their answer to paragraph 46, as if fully set forth herein.**

47.    Defendants received goods on account from CGI in the amount of the Unpaid Receivable.

**ANSWER: Denies.**

48.    Defendants did not remit payment to CGI for the Unpaid Receivable.

**ANSWER: Defendants deny any collective obligation to remit payment to CGI for Unpaid Receivables, and deny any remaining allegations.**

49.    CGI's bankruptcy estate (the "CGI Estate") is entitled to payment of the Unpaid Receivable plus costs, expenses, and statutory interest under 815 Ill. Comp. Stat. Ann. 205/2.

**ANSWER: Denies.**

50.    Defendants are in possession, custody, and/or control of the Unpaid Receivable.

**ANSWER: Denies.**

51.    The Unpaid Receivable constitutes a matured, payable on demand, valid and existing debt, due and owing by the Defendants to the CGI Estate.

**ANSWER: Denies.**

52.    The Unpaid Receivable is property of the CGI Estate under 11 U.S.C. § 541(a), and thus subject to turnover pursuant to 11 U.S.C. § 542(b).

**ANSWER: Denies.**

53.    Accordingly, the Trustee seeks turnover of the Unpaid Receivable. In addition, pursuant to Article XV of the By-Laws and Section 13 of the Rules & Regulations, the Trustee seeks to recover reasonable attorney's fees, court costs, and all other expenses and costs incurred in recovering the Unpaid Receivable.

**ANSWER: Denies.**

<u>**COUNT TWO**</u>
**Breach of Contract**
**(Against All Defendants)**

54.    Pleading in the alternative to Count One, the Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 54, as if fully set forth herein.**

55.    The Purchasing Arrangement is a valid and enforceable contract governed by the course of dealing between the parties, the By-Laws, and the Rules & Regulations.

**ANSWER: Denies.**

56.    Pursuant to the Purchasing Arrangement, Defendants received goods on account from CGI in the amount of the Unpaid Receivable.

**ANSWER: Denies.**

57.     CGI fully performed its obligations under the Purchasing Arrangement.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

58.     Defendants did not maintain an open ACH account to satisfy all amounts owed to CGI for goods purchased on account, and Defendants otherwise failed to remit payment.

**ANSWER: Denies.**

59.     The Trustee sent Defendants the Demand Letter.

**ANSWER: These Defendants admit that they received a Demand Letter. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations.**

60.     Defendants failed to pay the Unpaid Receivable and thus materially breached the Purchasing Arrangement, the By-Laws, and the Rules & Regulations.

**ANSWER: Defendants deny that they are liable for the Unpaid Receivables, and therefore deny any remaining allegations.**

61.     The CGI Estate is entitled to payment of the Unpaid Receivable.

**ANSWER: Denies.**

62.     As a result of their breach, Defendants have caused CGI to incur damages in an amount equal to, at least, the Unpaid Receivable plus costs, expenses, and statutory interest under 815 Ill. Comp. Stat. Ann. 205/2.

**ANSWER: Denies.**

63.     Accordingly, the Trustee seeks to recover these damages. In addition, pursuant to Section XV of the By-Laws and Section 13 of the Rules & Regulations, the Trustee seeks to

recover reasonable attorney's fees, court costs, and all other expenses and costs incurred recovering the Unpaid Receivable.

**ANSWER: Denies.**

## COUNT THREE
### Avoidance of Fraudulent Obligations
### Pursuant to 11 U.S.C. § 548(a)(1)(B) – 2016 Patronage Dividend
### (Against Avoidance Defendants)

64.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 64, as if fully set forth herein.**

65.     On or within two years before the Petition Date, CGI authorized the 2016 Patronage Dividend.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

66.     The 2016 Patronage Dividend constitutes an obligation incurred by CGI.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

67.     CGI incurred this obligation for the benefit of the Avoidance Defendants.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

68.     CGI received less than reasonably equivalent value in exchange for incurring this obligation.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

69.     CGI was insolvent at the time of or as a result of incurring this obligation. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time that CGI incurred this obligation.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

70. Accordingly, the Trustee seeks to avoid the 2016 Patronage Dividend obligation pursuant to 11 U.S.C. § 548(a)(1)(B).

**ANSWER: Denies that the trustee is entitled to avoid the 2016 Patronage Dividend, and denies any remaining allegations.**

## COUNT FOUR
### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 548(a)(1)(B) – Patronage Dividend Transfers
### (Against Avoidance Defendants)

71.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 71, as if fully set forth herein.**

72.     On or within two years before the Petition Date, CGI transferred the Patronage Dividend Transfers the Avoidance Defendants.

**ANSWER: Denies.**

73.     The Patronage Dividend Transfers constitute transfers of an interest in CGI's property.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

74.    The Patronage Dividend Transfers were made to or for the benefit of the Avoidance Defendants.

**ANSWER: Denies.**

75.    CGI received less than reasonably equivalent value in exchange for the Patronage Dividend Transfers.

**ANSWER: Denies.**

76.    CGI was insolvent at the time of or as a result of the Patronage Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time that CGI made the Patronage Dividend Transfers.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

77.    Accordingly, the Trustee seeks to avoid the Patronage Dividend Transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

**ANSWER: Defendants deny that the trustee is entitled to avoid the Patronage Dividend Transfers, and denies any remaining allegations.**

## <u>COUNT FIVE</u>

**Avoidance of Fraudulent Obligations
Pursuant to 11 U.S.C. § 548(a)(1)(B) – Allowance Dividend Transfers
(Against Avoidance Defendants)**

78.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 78, as if fully set forth herein.**

79.    CGI had no obligation to make the Allowance Dividend Transfers.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

80.     If, however, CGI had an obligation to make the Allowance Dividend Transfers, that obligation was incurred on or within two years before the Petition Date.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

81.     If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI did so for the benefit of the Avoidance Defendants.

**ANSWER: Denies.**

82.     If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI received less than reasonably equivalent value in exchange for doing so.

**ANSWER: Denies.**

83.     If CGI had an obligation to make the Allowance Dividend Transfers, CGI was insolvent at the time of or as a result of incurring that obligation. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the Allowance Dividend Transfers.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

84.     Accordingly, to the extent that CGI incurred any obligation to make the Allowance Dividend Transfers, the Trustee seeks to avoid that obligation pursuant to 11 U.S.C. § 548(a)(1)(B).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers, and denies any remaining allegations.**

## COUNT SIX

### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 548(a)(1)(B) – Allowance Dividend Transfers
### (Against Avoidance Defendants)

85.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 85, as if fully set forth herein.**

86.     On or within two years before the Petition Date, CGI made the Allowance Dividend Transfers to the Avoidance Defendants.

**ANSWER: Denies.**

87.     The Allowance Dividend Transfers constitute transfers of an interest in CGI's property.

**ANSWER: Denies.**

88.     The Allowance Dividend Transfers were made to or for the benefit of the Avoidance Defendants.

**ANSWER: Denies.**

89.     CGI received less than reasonably equivalent value in exchange for the Allowance Dividend Transfers.

**ANSWER: Denies.**

90.     CGI was insolvent at the time of or as a result of the Allowance Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended

to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time that CGI made the Allowance Dividend Transfers.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

91.     Accordingly, the Trustee seeks to avoid the Allowance Dividend Transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers, and denies any remaining allegations.**

## COUNT SEVEN

**Avoidance of Fraudulent Obligations**
**Pursuant to 11 U.S.C. § 548(a)(1)(B) – Redemption Payments**
**(Against Avoidance Defendants)**

92.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 92, as if fully set forth herein.**

93.     CGI had no obligation to make the Redemption Payments.

**ANSWER: Denies.**

94.     If, however, CGI had an obligation to make the Redemption Payments, that obligation was incurred on or within two years before the Petition Date.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

95.     If CGI incurred an obligation to make the Redemption Payments, CGI did so for the benefit of the Avoidance Defendants.

**ANSWER: Denies.**

96.     If CGI incurred an obligation to make the Redemption Payments, CGI received less than reasonably equivalent value in exchange for doing so.

**ANSWER: Denies.**

97.     If CGI had an obligation to make the Redemption Payments, CGI was insolvent at the time of or as a result of incurring that obligation. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the Redemption Payments.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

98.     Accordingly, to the extent that CGI incurred any obligation to make the Redemption Payments, the Trustee seeks to avoid that obligation pursuant to 11 U.S.C. § 548(a)(1)(B).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers and denies any remaining allegations.**

## COUNT EIGHT

**Avoidance of Fraudulent Transfers
Pursuant to 11 U.S.C. § 548(a)(1)(B) – Redemption Payments
(Against Avoidance Defendants)**

99.     The Trustee re-alleges the allegations set forth in the above paragraphs in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 99, as if fully set forth herein.**

100.    On or within two years before the Petition Date, CGI made the Redemption Payments to the Avoidance Defendants.

**ANSWER: Denies.**

101.    The Redemption Payments constitute transfers of an interest in CGI's property.

**ANSWER: Denies.**

102.    The Redemption Payments were made to or for the benefit of the Avoidance Defendants.

**ANSWER: Denies.**

103.    CGI received less than reasonably equivalent value in exchange for the Redemption Payments.

**ANSWER: Denies.**

104.    CGI was insolvent at the time of or as a result of the Redemption Payments. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of the Redemption Payments.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

105.    Accordingly, the Trustee seeks to avoid the Redemption Payments pursuant to 11 U.S.C. § 548(a)(1)(B).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers and denies any remaining allegations.**

## COUNT NINE

**Avoidance of Fraudulent Obligation**

**Pursuant to 11 U.S.C. § 548(a)(1)(B) – Purchase Deposit Transfers**
**(Against Avoidance Defendants)**

106.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 106, as if fully set forth herein.**

107.    CGI had no obligation to make the Purchase Deposit Transfers.

**ANSWER: Denies.**

108.    If, however, CGI had an obligation to issue the Purchase Deposit Transfers, that obligation was incurred on or within two years before the Petition Date.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

109.    If CGI incurred an obligation to issue the Purchase Deposit Transfers, CGI did so for the benefit of the Avoidance Defendants.

**ANSWER: Denies.**

110.    If CGI incurred an obligation to issue the Purchase Deposit Transfers, CGI received less than reasonably equivalent value in exchange for doing so.

**ANSWER: Denies.**

111.    If CGI had an obligation to make the Purchase Deposit Transfers, CGI was insolvent at the time of or as a result of incurring that obligation. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the Purchase Deposit Transfers.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

112.    Accordingly, to the extent that CGI incurred any obligation to make the Purchase Deposit Transfers, the Trustee seeks to avoid that obligation pursuant to 11 U.S.C. § 548(a)(1)(B).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers and denies any remaining allegations.**

<u>**COUNT TEN**</u>

**Avoidance of Fraudulent Transfers
Pursuant to 11 U.S.C. § 548(a)(1)(B) – Purchase Deposit Transfers
(Against Avoidance Defendants)**

113.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 113, as if fully set forth herein.**

114.    On or within two years before the Petition Date, CGI made the Purchase Deposit Transfers to the Avoidance Defendants.

**ANSWER: Denies.**

115.    The Purchase Deposit Transfers constitute transfers of an interest in CGI's property.

**ANSWER: Denies.**

116.    The Purchase Deposit Transfers were made to or for the benefit of Avoidance Defendants.

**ANSWER: Denies.**

117.    CGI received less than reasonably equivalent value in exchange for the Purchase Deposit Transfers.

**ANSWER: Denies.**

118.    CGI was insolvent at the time of or as a result of Purchase Deposit Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of the Purchase Deposit Transfers.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

119.    Accordingly, the Trustee seeks to avoid the Purchase Deposit Transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers and denies any remaining allegations.**

## COUNT ELEVEN

**Avoidance of Preferential Transfers
Pursuant to 11 U.S.C. § 547(b) – Purchase Deposit Transfers
(Against Avoidance Defendants)**

120.    Pleading in the alternative to Count Ten, the Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 120, as if fully set forth herein.**

121.    Within 90 days before the Petition Date, CGI made the Purchase Deposit Transfers, or caused such transfers to be made, to the Avoidance Defendants.

**ANSWER: Denies.**

122.    The Purchase Deposit Transfers constitute transfers of an interest in CGI's property.

**ANSWER: Denies.**

123.    The Purchase Deposit Transfers were made to or for the benefit of the Avoidance Defendants, which were creditors of CGI.

**ANSWER: Denies.**

124.    The Purchase Deposit Transfers were made for or on account of one or more antecedents debts owed by CGI to the Avoidance Defendants prior to the date on which such transfers were made.

**ANSWER: Denies.**

125.    CGI was insolvent when the Purchase Deposit Transfers were made.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

126.    The Purchase Deposit Transfers enabled the Avoidance Defendants to receive more than they would have received if: (a) such transfers had not been made; and (b) the Avoidance Defendants had received payment of the underlying debt pursuant to chapter 7 of the Bankruptcy Code.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

127.    Accordingly, the Trustee seeks to avoid the Purchase Deposit Transfers pursuant to 11 U.S.C. § 547(b).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers and denies any remaining allegations.**

### COUNT TWELVE

**Avoidance of Fraudulent Obligations
Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – 2016 Patronage Dividend
(Against Avoidance Defendants)**

128.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 128, as if fully set forth herein.**

129.    On or within four years before the Petition Date, CGI authorized the 2016 Patronage Dividend.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

130.    The 2016 Patronage Dividend constitutes an obligation incurred by CGI.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

131.    CGI incurred this obligation for the benefit of the Avoidance Defendants.

**ANSWER: Denies.**

132.    CGI received less than reasonably equivalent value in exchange for incurring this obligation.

**ANSWER: Denies.**

133.    CGI was insolvent at the time of or as a result of incurring this obligation. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the 2016 Patronage Dividend.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

134.     Accordingly, the Trustee seeks to avoid the 2016 Patronage Dividend obligation pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers, and denies any remaining allegations.**

## COUNT THIRTEEN

### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Patronage Dividend Transfers
### (Against Avoidance Defendants)

135.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 135, as if fully set forth herein.**

136.     On or within four years before the Petition Date, CGI transferred the Patronage Dividend Transfers to the Avoidance Defendants.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

137.     The Patronage Dividend Transfers constitute transfers of an interest in CGI's property.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

138.     The Patronage Dividend Transfers were made to or for the benefit of the Avoidance Defendants.

**ANSWER: Denies.**

139.     CGI received less than reasonably equivalent value in exchange for the Patronage Dividend Transfers.

**ANSWER: Denies.**

140.     CGI was insolvent at the time of or as a result of Patronage Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of the Patronage Dividend Transfers.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

141.    Accordingly, the Trustee seeks to avoid the Patronage Dividend Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers and denies any remaining allegations.**

## COUNT FOURTEEN

**Avoidance of Fraudulent Obligations**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Allowance Dividend Transfers**
**(Against Avoidance Defendants)**

142.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 142, as if fully set forth herein.**

143.    CGI had no obligation to make the Allowance Dividend Transfers.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

144.    If, however, CGI incurred an obligation to make the Allowance Dividend Transfers, that obligation was incurred within four years before the Petition Date.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

145.    If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI did so for the benefit of the Avoidance Defendants.

**ANSWER: Denies.**

146.    If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI received less than reasonably equivalent value in exchange for doing so.

**ANSWER: Denies.**

147.    If CGI had an obligation to make the Allowance Dividend Transfers, CGI was insolvent at the time of or as a result of incurring that obligation. CGI also was engaged in a

business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the Allowance Dividend Transfers.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

148.    Accordingly, to the extent that CGI incurred any obligation to make the Allowance Dividend Transfers, the Trustee seeks to avoid that obligation pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers and denies any remaining allegations.**

<u>COUNT FIFTEEN</u>

**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Allowance Dividend Transfers**
**(Against Avoidance Defendants)**

149.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 149, as if fully set forth herein.**

150.    On or within before the Petition Date, CGI made the Allowance Dividend Transfers to the Avoidance Defendants.

**ANSWER: Denies.**

151.    The Allowance Dividend Transfers constitute transfers of an interest in CGI's property.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

152.   The Allowance Dividend Transfers were made to or for the benefit of the Avoidance Defendants.

**ANSWER: Denies.**

153.   CGI received less than reasonably equivalent value in exchange for the Allowance Dividend Transfers.

**ANSWER: Denies.**

154.   CGI was insolvent at the time of or as a result of Allowance Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of the Allowance Dividend Transfers.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

155.   Accordingly, the Trustee seeks to avoid the Allowance Dividend Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers and denies any remaining allegations.**

## COUNT SIXTEEN

**Avoidance of Fraudulent Obligations
Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Redemption Payments
(Against Avoidance Defendants)**

156.   The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 156, as if fully set forth herein**

157.   CGI had no obligation to make the Redemption Payments.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

158.    If, however, CGI incurred an obligation to make the Redemption Payments, CGI did so on or within four years before the Petition Date.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

159.    If CGI incurred an obligation to make the Redemption Payments, CGI did so for the benefit of the Avoidance Defendants.

**ANSWER: Denies.**

160.    If CGI incurred an obligation to make the Redemption Payments, CGI received less than reasonably equivalent value in exchange for doing so.

**ANSWER: Denies.**

161.    If CGI had an obligation to make the Redemption Payments, CGI was insolvent at the time of or as a result of incurring that obligation. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the Redemption Payments.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

162.    Accordingly, to the extent that CGI incurred any obligation to make the Redemption Payments, the Trustee seeks to avoid that obligation pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers and denies any remaining allegations.**

<u>**COUNT SEVENTEEN**</u>

**Avoidance of Fraudulent Transfers
Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Redemption Payments
(Against Avoidance Defendants)**

163.    The Trustee re-alleges the allegations set forth in the above paragraphs in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 163, as if fully set forth herein.**

164.    On or within four years before the Petition Date, CGI made the Redemption Payments to the Avoidance Defendants.

**ANSWER: Denies.**

165.    The Redemption Payments constitute transfers of an interest in CGI's property.

**ANSWER: Denies.**

166.    The Redemption Payments were made to or for the benefit of the Avoidance Defendants.

**ANSWER: Denies.**

167.    CGI received less than reasonably equivalent value in exchange for the Redemption Payments.

**ANSWER: Denies.**

168.    CGI was insolvent at the time of or as a result of Redemption Payments. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it

would incur, debts that were beyond its ability to pay as such debts matured at the time of the Redemption Payments.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

169.    Accordingly, the Trustee seeks to avoid the Redemption Payments pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers and denies any remaining allegations.**

## COUNT EIGHTEEN

### Avoidance of Fraudulent Obligations
### Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Purchase Deposit Transfers
### (Against Avoidance Defendants)

170.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 170, as if fully set forth herein.**

171.    CGI had no obligation to make the Purchase Deposit Transfers.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

172.    If, however, CGI incurred an obligation to make the Purchase Deposit Transfers, CGI did so on or within four years before the Petition Date.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

173.    If CGI incurred an obligation to make the Purchase Deposit Transfers, CGI did so for the benefit of the Avoidance Defendants.

**ANSWER: Denies.**

174.    If CGI incurred an obligation to make the Purchase Deposit Transfers, CGI received less than reasonably equivalent value in exchange for doing so.

**ANSWER: Denies.**

175.    If CGI had an obligation to make the Purchase Deposit Transfers, CGI was insolvent at the time of or as a result of incurring that obligation. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the Purchase Deposit Transfers.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

176.    Accordingly, to the extent that CGI incurred any obligation to make the Purchase Deposit Transfers, the Trustee seeks to avoid that obligation pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers and denies any remaining allegations.**

<u>**COUNT NINETEEN**</u>

**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Purchase Deposit Transfers**
**(Against Avoidance Defendants)**

177.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 177, as if fully set forth herein.**

178.    On or within four years before the Petition Date, CGI made the Purchase Deposit Transfers to the Avoidance Defendants.

**ANSWER: Denies.**

179.    The Purchase Deposit Transfers constitute transfers of an interest in CGI's property.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

180.    The Purchase Deposit Transfers were made to or for the benefit of the Avoidance Defendants.

**ANSWER: Denies.**

181.    CGI received less than reasonably equivalent value in exchange for the Purchase Deposit Transfers.

**ANSWER: Denies.**

182.    CGI was insolvent at the time of or as a result of Purchase Deposit Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of the Purchase Deposit Transfers.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

183.    Accordingly, the Trustee seeks to avoid the Purchase Deposit Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers and denies any remaining allegations.**

## COUNT TWENTY

**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/6 – Purchase Deposit Transfers**
**(Against Avoidance Defendants)**

184.     Pleading in the alternative to Count Nineteen, the Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 184, as if fully set forth herein.**

185.     On or within four years before the Petition Date, CGI made the Purchase Deposit Transfers to the Avoidance Defendants.

**ANSWER: Denies.**

186.     The Purchase Deposit Transfers constitute transfers of an interest in CGI's property.

**ANSWER: Denies.**

187.     CGI received less than reasonably equivalent value in exchange for the Purchase Deposit Transfers.

**ANSWER: Denies.**

188.     The Purchase Deposit Transfers were made to or for the benefit of the Avoidance Defendants, which were creditors of CGI.

**ANSWER: Defendants deny that the Purchase Deposit Transfers were made for the benefit of the Avoidance Defendants, and therefore denies the allegations.**

189.     The Purchase Deposit Transfers were made for or on account of one or more antecedents debts owed by CGI to the Avoidance Defendants prior to the date on which such transfers were made.

**ANSWER: Defendants deny that the Purchase Deposit Transfers were made for the benefit of the Avoidance Defendants, and therefore denies the allegations.**

190.    CGI was insolvent when the Purchase Deposit Transfers were made.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

191.    Accordingly, the Trustee seeks to avoid the Purchase Deposit Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/6(a).

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers and denies any remaining allegations.**

## <u>COUNT TWENTY-ONE</u>

### Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)
### (Against Avoidance Defendants)

192.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 191.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 192, as if fully set forth herein.**

193.    The Patronage Dividend Transfers, the Allowance Dividend Transfers, the Redemption Payments, and the Purchase Deposit Transfers are subject to avoidance pursuant to 11 U.S.C. §§ 544(b), 547(b), and 548(a)(1)(B).

**ANSWER: Denies.**

194.    The Avoidance Defendants received the Patronage Dividend Transfers, the Allowance Dividend Transfers, the Redemption Payments, and the Purchase Deposit Transfers as the initial transferees.

**ANSWER: Denies.**

195.    Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trustee seeks to recover the value of the Patronage Dividend Transfers, the Allowance Dividend Transfers, the Redemption Payments, and the Purchase Deposit Transfers from the Avoidance Defendants.

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers and denies any remaining allegations.**

<u>**COUNT TWENTY-TWO**</u>

**Turnover of Property
Pursuant to 11 U.S.C. § 542(b) – Promissory Note Debt
(Against North)**

196.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 196, as if fully set forth herein.**

197.    North executed the Loan Documents in favor of CGI.

**ANSWER: Admits.**

198.    CGI fully performed under the Loan Documents.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

199.    Under the Note, North was required to, among other things, make periodic payments of principal and interest to CGI until the principal was paid in full.

**ANSWER: Admits.**

200.    North failed to make all required payments due under the Note and thus is in default.

**ANSWER: North admits that it did not make some payments under the Note. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations.**

201.    On or about May 31, 2018, the Trustee sent the Demand Letter to North in accordance with the Acceleration Procedure.

**ANSWER: Denies.**

202.    North did not make payment or otherwise respond.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

203.    On or about June 5, 2018, the Trustee declared all outstanding interest, penalties, and principal immediately due and payable in the amount the Note Obligation.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

204.    Defendants are in possession, custody, and control of the Note Obligation.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

205.    The Note Obligation constitutes a matured, payable on demand, valid and existing debt, due and owing by North to the CGI Estate.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

206.    The CGI Estate is also entitled to collect statutory interest from North under 815 Ill. Comp. Stat. Ann. 205/2.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

207.    The Note Obligation is property of the CGI Estate under 11 U.S.C. § 541(a), and thus subject to turnover pursuant to 11 U.S.C. § 542(b).

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

208.    Accordingly, the Trustee seeks turnover of the Note Obligation. In addition, pursuant to Section XV of the By-Laws, Section 13 of the Rules & Regulations, and Section 6(F) of the Note, the Trustee seeks to recover reasonable attorney's fees, court costs, and all other expenses and costs incurred enforcing the Note and other Loan Documents.

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers or other alleged liabilities, and denies any remaining allegations.**

<u>**COUNT TWENTY-THREE**</u>

**Breach of Promissory Note**
**(Against North)**

209.    Pleading in the alternative to Count Twenty-Two, the Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 209, as if fully set forth herein.**

210.    The Note constitutes an enforceable contract between CGI and North.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

211.    CGI fully complied with the Note.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

212.    North materially breached the Note by failing to pay all sums due thereunder.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

213.    As a result of their breach, North caused CGI to incur damages in an amount equal to, at least, the Note Obligation plus costs, expenses, penalties, contractual interest, and statutory interest under 815 Ill. Comp. Stat. Ann. 205/2.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

214.    Accordingly, the Trustee seeks to recover these damages. In addition, pursuant to Section XV of the By-Laws, Section 13 of the Rules & Regulations, and Section 6(F) of the Note, the Trustee seeks to recover reasonable attorney's fees, court costs, and all other expenses and costs incurred enforcing the Note and other Loan Documents.

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers or other alleged liabilities, and denies any remaining allegations.**

<u>**COUNT TWENTY-FOUR**</u>

**Breach of Guaranty**
**(Against James Casaccio and Tom Casaccio)**

215.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 215, as if fully set forth herein.**

216.    On or about October 20, 2014, James Casaccio and Tom Casaccio (collectively, the "<u>Guarantors</u>") each executed a separate but identical continuing guaranty by which each became jointly and severally liable for "prompt payment and fulfillment of all loans or obligations of any nature" owed to CGI by North (collectively, the "<u>Guaranties</u>"). *See* Exhibits F-10 & F-11.

**ANSWER: James Casaccio and Tom Casaccio admit that they signed guarantees, but deny that the remaining allegations fully and accurately recite the terms of the guarantees.**

217.    The Unpaid Receivable, the Patronage Dividend Transfers, the Allowance Dividend Transfers, the Redemption Payments, the Purchase Deposit Transfers, and the Note Obligation constitute loans or obligations owed to CGI by North.

**ANSWER: Denies.**

218.    On or about May 31, 2018, the Trustee sent the Demand Letter to the Guarantors, wherein the Trustee demanded prompt and full payment of the Unpaid Receivable, the Patronage Dividend Transfers, the Redemption Payments, the Purchase Deposit Transfers, and the Note Obligation.

**ANSWER: Denies.**

219.    The Guarantors failed to make payment of such loans or obligations.

**ANSWER: Defendants admit that after June 1, 2018, the Defendants did not make any payments on the Loan. Defendants deny that James Casaccio and Tom Casaccio are liable for any other alleged transfers, and further deny any remaining allegations.**

220.    By failing to make payment, the Guarantors breached the Guaranties and are in default under the Note.

**ANSWER: Denies.**

221.    As a result of their breach, the Guarantors have caused CGI to incur damages in an amount equal to, at least, the sum of (a) the Unpaid Receivable, (b) the Patronage Dividend Transfers, (c) the Allowance Dividend Transfers, (d) the Redemption Payments, (e) the Purchase Deposit Transfers, (f) the Note Obligation, and (g) all related costs, expenses, interest, and penalties.

**ANSWER: Denies.**

222.    Accordingly, the Trustee seeks to recover these damages. In addition, pursuant to Section XV of the By-Laws, Section 13 of the Rules & Regulations, Section 6(F) of the Note, and Section 10 of the Guaranties, the Trustee seeks to recover reasonable attorney's fees, court costs, and all other expenses and costs incurred enforcing the Guaranties.

**ANSWER: Defendants deny that the trustee is entitled to avoid any claimed transfers or other alleged liabilities, and denies any remaining allegations.**

### COUNT TWENTY-FIVE

**Claim for Indemnity**
**(Against North, James Casaccio, and Tom Casaccio)**

223.    Trustee re-alleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 223, as if fully set forth herein.**

224.    On or about October 20, 2014, North, James Casaccio, and Tom Casaccio (collectively, the "Indemnitors") executed separate but identical indemnity agreements by which each agreed to indemnify CGI against all claims and expenses (including attorney's fees, expenses, and court costs) that arise out of, among other things, collection of the Unpaid Receivable and enforcement of the By-Laws, the Note, and the Guaranty (collectively, the "Indemnity Agreements"). *See* Exhibits F-12, F-13, & F-14.

**ANSWER: James Casaccio and Tom Casaccio admit that they executed indemnity agreements. Defendants deny the remaining allegations.**

225.    On or about May 31, 2018, the Trustee sent the Demand Letter to the Indemnitors, whereby the Indemnitors were notified of the Trustee's intent to seek indemnification should enforcment of the Purchasing Arrangement and the Note become necessary.

**ANSWER: Denies.**

226.    Pursuant to the Indemnity Agreements, the Trustee seeks to recover all fees and costs incurred to bring this enforcement action from the Indemnitors.

**ANSWER: Defendants deny that the trustee is entitled to the relief requested, and denies any remaining allegations.**

## COUNT TWENTY-SIX

**Unjust Enrichment**
**(Against All Defendants)**

227.    Pleading in the alternative to Counts One through Twenty-Five, the Trustee realleges the allegations set forth in paragraphs 1 through 45.

**ANSWER: Defendants restate their answers to paragraphs 1 through 45 as and for their answer to paragraph 227, as if fully set forth herein.**

228.    Defendants received benefits—at CGI's expense—in connection with the Purchasing Arrangement, the Loan Documents, and certain avoidable transfers. Specifically, Defendants received benefits associated with the Unpaid Receivable, the Patronage Dividend Transfers, the Allowance Dividend Transfers, the Redemption Payments, the Purchase Deposit Transfers, and the Note Obligation.

**ANSWER: Denies.**

229.    Defendants have unjustly retained these benefits to CGI's detriment, even though the Trustee has attempted to recover these benefits through the Demand Letter.

**ANSWER: Denies.**

230.    Retention of these benefits by Defendants violates fundamental principles of justice, equity, and good conscience.

**ANSWER: Denies.**

231.    Accordingly, the Trustee seeks to recover the amount by which Defendants have been unjustly enriched.

**ANSWER: Defendants deny that the trustee is entitled to the relief requested, and denies any remaining allegations.**

## COUNT TWENTY-SEVEN

### Disallowance of Claims Pursuant to 11 U.S.C. § 502
### (Against All Defendants)

232.    The Trustee re-alleges the allegations set forth in the above paragraphs.

**ANSWER: Defendants restate their answers to the paragraphs set forth above as and for their answer to paragraph 232, as if fully stated herein.**

233.    This count is asserted against Defendants to the extent that any claims have been filed by or scheduled on behalf of Defendants against the CGI Estate.

**ANSWER: No allegation is contained in paragraph 233. To the extent an answer is required, Denies.**

234.    Defendants are persons or entities from which property is recoverable under 11 U.S.C. §§ 542 and 550 (the "Recoverable Property").

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

235.    Defendants have not turned over the Recoverable Property to the CGI Estate.

**ANSWER: Denies that any property is required to be turned over to the CGI Estate, and therefore denies the allegations.**

236.    Accordingly, pursuant to 11 U.S.C. § 502(d), the Trustee hereby objects to and seeks disallowance of any claims by Defendants against the CGI Estate. Moreover, pursuant to 11 U.S.C. § 502(j), the Trustee seeks reconsideration and disallowance of any claims by

Defendants against the CGI Estate to the extent that such claims have been allowed by this Court.

**ANSWER: Denies.**

## CONDITIONS PRECEDENT

237.  All conditions precedent to the Trustee's claims for relief have been performed or have occurred.

**ANSWER: Defendants lack information sufficient to form a belief as to the truth of the allegations.**

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

1.  Market Fresh North, Inc. ("North") filed a bankruptcy proceeding in the Northern District Court for the Northern District of Illinois, no. 17-22189.

2.  North and CGI settled all claims by and between North and CGI, and such settlement was approved by the Bankruptcy Court on or about February 5, 2018.

3.  Accordingly, CGI, and the Trustee, have no claim against North.

4.  CGI and the Trustee also have no further claims against James Casaccio and Tom Casaccio arising out of or related to any liabilities of North.

### Second Affirmative Defense

5.  CGI's extension of the loan releases James Casaccio and Tom Casaccio from their alleged guaranty obligations pursuant to 810 ILCS 5/3-605.

Wherefore, the Defendants, James Casaccio, Tom Casaccio, Market Fresh, Inc. and Market Fresh North, Inc., deny that the Plaintiff is entitled to any claimed relief. Defendants request that this Court dismiss Plaintiff's Complaint and award attorney's fees and costs to the Defendants. Defendants also request such other and further relief as this Court deems just.

Respectfully submitted,

/s/ Mark D. Roth
Mark D. Roth

Mark D. Roth
Roth Fioretti LLC
311 S. Wacker, Suite 2470
Chicago IL 60606
(312)-922-6262
Mark@Rothfioretti.com